780 F.2d 386
 121 L.R.R.M. (BNA) 2487
 Roy A. JOHNSON and John J. Sheller, Appellees,
v.
Verne ORR, Secretary of the Air Force, Francis Gerard, Major
General, Wilfred C. Menard, Jr., Major General, Colonel John
Murphy, Brigadier General Charles Young, Air Commander Lt.
Col. Billy McDaniel.
Appeal of Air Commander Lt. Col. Billy McDANIEL, Appellant
in No. 84-5859.
Appeal of Wilfred C. MENARD, Jr., Major General, Colonel
John Murphy, Brigadier General Charles Young,
Appellants in No. 84-5860.
 Nos. 84-5859, 84-5860.
 United States Court of Appeals,
Third Circuit.
 Argued Sept. 10, 1985.
Decided Jan. 13, 1986.
Rehearing and Rehearing En Banc Denied March 17, 1986.
 
 C. Roger Lunder, Major, Staff Judge Advocate, State of New York, Division of Military and Navy Affairs, Albany, N.Y., for amicus curiae Adjutants General Ass'n. of U.S.
 John K. Van de Kamp, Atty. Gen. of Cal., N. Eugene Hill, Asst. Atty. Gen., Robert E. Murphy, Deputy Atty. Gen., San Francisco, Cal., for amicus curiae State of Cal. and the Adjutant General of the California National Guard.
 Gay Snyder, Martin R. Cohen (argued), American Federation of Government Employees, New Brunswick, N.J., Mark Roth, Gen. Counsel, American Federation of Government Employees, Washington, D.C., for appellees Johnson and Sheller.
 Irwin I. Kimmelman, Atty. Gen. of N.J., Eugene Sullivan, Dorothy Donnelly (argued), Deputy Attys. Gen., Trenton, N.J., for appellant in 84-5859.
 W. Hunt Dumont, U.S. Atty., Bette E. Uhrmacher (argued), Asst. U.S. Atty., Trenton, N.J., for appellants in 84-5860.
 Before SEITZ, BECKER and ROSENN, Circuit Judges.
 OPINION OF THE COURT
 BECKER, Circuit Judge.
 
 
 1
 The issue before us, on a certified question from the district court, 28 U.S.C. Sec. 1292(b) (1982), is whether Air National Guard ("ANG") technician supervisory personnel and the New Jersey Adjutant General act under color of state law for the purposes of 42 U.S.C. Sec. 1983 (1982) when participating in personnel decisions resulting in the dismissal of ANG technicians. The district court held that they do, and we affirm.
 
 I.
 
 2
 Appellees Roy A. Johnson and John J. Sheller were ANG technicians and stewards in the technicians' union, Local 377 of the American Federation of Government Employees. As a result of a series of events arising out of a dispute over a proposed change in the technicians' work hours, appellees were discharged. The discharges were upheld in administrative hearings before an ANG hearing examiner, whose findings were adopted by the New Jersey Adjutant General.
 
 
 3
 On August 6, 1982 appellees brought this action in the district court for the District of New Jersey against their supervisors John Murphy and Charles Young; Secretary of the Air Force Verne Orr; Major General Wilfred Menard, who was New Jersey Adjutant at the time of appellees discharge; and Major General Francis Gerard, who succeeded Menard as New Jersey Adjutant General. Appellees' complaint alleged improper discharge in violation of their first and fifth amendment rights (Bivens claims)[1]; improper discharge in violation of the Administrative Procedure Act (APA), 5 U.S.C. Sec. 701 et seq. (1982); and violation of 42 U.S.C. Sec. 1983 on account of due process and various first and fifth amendment infractions. An amended complaint was filed in January, 1984, adding as a defendant Billy McDaniel, a technician personnel officer who had advised the other defendants concerning the discharge of plaintiffs.[2]
 
 
 4
 Following a hearing in March, 1983, the district court transferred all damage claims to the United States Claims Court pursuant to 28 U.S.C. Sec. 1406(c) (1982) and dismissed the Bivens claims. Both sides moved for summary judgment with respect to the remaining claims. In July, 1984 the district court granted summary judgment for plaintiffs on their APA claims and summary judgment for defendants with respect to the due process claim. The district court denied summary judgment with respect to the other claims brought under section 1983, specifically rejecting defendants' argument that a section 1983 action could not be brought against National Guard supervisory personnel. On a motion for partial reconsideration, the district court agreed to certify for interlocutory appeal the question whether persons such as Murphy, Young, McDaniel, and Menard, who discharge technicians employed under 32 U.S.C. Sec. 709, act under the color of state law for section 1983 purposes. This court accepted the certification and defendants appealed.[3]
 
 II.
 
 5
 The question whether appellants acted under color of state law is difficult because of the National Guard's unusual "hybrid" status as an agency with both federal and state characteristics. In New Jersey Air Nat'l Guard v. Fed. Labor Rel. Auth., 677 F.2d 276 (3d Cir.1982), we described this status as follows:
 
 
 6
 The National Guard occupies a unique position in the federal structure ... This role does not fit neatly within the scope of either state or national concerns; historically the guard has been, and today remains, something of a hybrid. Within each state the National Guard is a state agency, under state authority and control. At the same time, the activity, makeup, and function of the Guard is provided for, to a large extent, by federal law.
 
 
 7
 Id. at 278-79. Indeed, the Guard's function, as well as its structure, is hybrid. The Guard "serves the state in time of civil emergencies within the state as well as being available for federal service during national emergencies." Engblom v. Carey, 522 F.Supp. 57, 65 (S.D.N.Y.1981).
 
 
 8
 Appellants focus on the federal statutory scheme that governs ANG, 32 U.S.C. Sec. 709 (1982). They point out first that the 1968 National Guard Technicians Act makes them (with the exception of Adjutant General Menard, a state cabinet officer appointed by the governor) federal employees.[4] Appellants further emphasize that their authority to discharge appellees derives directly and exclusively from federal statute and that such discharges are effected pursuant to regulations prescribed by the Secretary of the Air Force, 32 U.S.C. 709(e).[5] They contend that New Jersey Air National Guard Regulations 40-13 (NJANG) does not constitute state law for section 1983 purposes because it simply restates the relevant federal regulations: NJANG's stated purpose is to "provide for the administration of the NJ Army and Air National Guard Technician Program and implement the provisions of the National Guard Bureau Technician Personnel Manual, Technician Personnel Pamphlets and applicable regulations of the U.S. Civil Service Commission's Federal Personnel manual." (emphasis added) Appellants argue that they could not possibly have acted under the color of state law, for there is no state law directing or authorizing their actions.
 
 
 9
 Appellants also argue that the Supreme Court's holding in Bush v. Lucas, 462 U.S. 367, 103 S.Ct. 2404, 76 L.Ed.2d 648 (1983), that congressional enactment of a comprehensive civil service scheme precluded an implied Bivens-type cause of action, should be extended to section 1983 actions. Because ANG operates pursuant to a comprehensive legislative scheme, appellants argue, a section 1983 remedy is inappropriate.[6]
 
 
 10
 Appellees rejoin that the state is so heavily involved in the National Guard program that the actions complained of were under color of state law. Their argument focuses on the Guard's actual administrative authority at the state level. The governor is the commander-in-chief of each Guard unit and the adjutant general, a state officer, is the chief acting executive. Appellees' discharge was effected by Adjutant General Menard: the other appellants worked under Menard. Appellees also observe that while the other appellants are federal employees, they had to maintain their rank in the state Guard in order to maintain their employment as federal technicians and thus be in the position to discharge appellees.[7]III.
 
 
 11
 The "under color of state law" requirement is identical to the "state action" requirement of the fourteenth amendment. Lugar v. Edmondson Oil Co. Inc. 457 U.S. 922, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982); Krynicky v. University of Pittsburgh, 742 F.2d 94 (3d Cir.1984). Thus, a showing that actions were "under color of state law," like a showing of the presence of "state action," does not require that the challenged action be pursuant to a state statute. Rather, the question is "whether there is a sufficiently close nexus between the State and the challenged action," Jackson v. Metropolitan Edison Co., 419 U.S. 345, 351, 95 S.Ct. 449, 453, 42 L.Ed.2d 477 (1974), or whether the state "has so far insinuated itself into a position of interdependence" that there is a "symbiotic relationship" between the actor and the state such that the challenged action can "fairly be attributed to the state." Krynicky, supra, at 99.
 
 
 12
 There is no set formula for determining whether the employees of an agency with both state and federal characteristics act under color of state law. All of the circumstances must be examined to consider whether the actions complained of were sufficiently linked to the state. See Lake Country Estates Inc. v. Tahoe Regional Planning Agency, 440 U.S. 391, 99 S.Ct. 1171, 59 L.Ed.2d 401 (1979). A crucial inquiry is "whether day-to-day operations are supervised by the Federal [or state] government." Detore v. Local 245 Jersey City Public Employers Union, 615 F.2d 980, 983 (3d Cir.1980) (quoting United States v. Orleans, 425 U.S. 807, 815, 96 S.Ct. 1971, 1976, 48 L.Ed.2d 390 (1976)).
 
 
 13
 While the National Guard's hybrid status complicates this inquiry, we have strong guidance from our opinion in Lasher v. Shafer, 460 F.2d 343 (3d Cir.1972), which involved facts strikingly similar to the facts of this case. In Lasher, National Guard technicians alleged that they had been demoted and abused by their supervisors because of their active union involvement. We concluded that defendants had acted under color of state law. We noted that the Pennsylvania National Guard is part of the state militia,[8] that the Pennsylvania Governor is commander-in-chief of the Guard, and that defendants had not been called into service of the United States at the time of the actions complained of. Id. at 346. Moreover, we explicitly rejected the argument, stressed by appellants in the instant case, that because the source of the National Guard's authority is federal, even actions administered at the state level were not under the color of state law. Id. at 348.
 
 
 14
 Lasher does not control this case because it concerned events that occurred prior to the National Guard Technicians Act of 1968. Although the 1968 Act had been passed by the time of the opinion, we explicitly refused to address whether the conclusion that National Guard personnel acted under the color of state law was altered by the 1968 Act. Therefore, we must make that determination in this case.
 
 
 15
 The 1968 Act, inter alia, made National Guard technicians, who had been state "caretakers" under the previous statute, federal employees. The fact that the Act conferred federal employee status on appellees is irrelevant to the issue of whether those who discharged them acted under color of state law. See supra note 4. The 1968 Act also made appellants, with the exception of Adjutant General Menard, federal employees; this too is not dispositive because the critical inquiry remains whether their actions were made possible by authority derived from the state. See Rowe v. State of Tennessee, 609 F.2d 259, 263 (6th Cir.1979) (explicitly rejecting the claim that "since as National Guard technicians they are federal employees, their disciplinary or retaliatory actions against Rowe were likewise under color of federal law.")
 
 
 16
 The crucial question is whether the 1968 Act was either intended to render, or had the effect of rendering the National Guard more federal in character to the point where technician supervisory personnel and the adjutant general can no longer be considered as acting under color of state law when participating in personnel decisions resulting in the discharge of ANG technicians. This question has been considered by the Fifth and Sixth Circuits, both of which have held that the 1968 Act was not designed to federalize the National Guard, and that Guard officials may be sued under section 1983. Rowe v. State of Tennessee, 609 F.2d 259 (6th Cir.1979); NeSmith v. Fulton, 615 F.2d 196 (5th Cir.1980). See also Schultz v. Wellman, 717 F.2d 301 (6th Cir.1983) (following Rowe );[9] Bollen v. National Guard Bureau, 449 F.Supp. 343, 349 (W.D.Pa.1978) (following Lasher without discussing the 1968 Act); Syrek v. Pennsylvania Air National Guard, 371 F.Supp. 1349 (W.D.Pa.1974) (following Lasher after explicitly finding that the 1968 Act did not federalize the Guard), rev'd on other grounds, 537 F.2d 66 (3d Cir.1976); contra Vargas v. Chardon, 405 F.Supp. 1348, 1351 (D.P.R.1975) (holding adjutant general not liable under section 1983 without discussing the 1968 Act).
 
 
 17
 The legislative history of the 1968 Act explicitly reveals the several purposes of that Act; federalizing the Guard's administration was not among them. The House Report unequivocally stated Congress' goals in passing the Act:
 
 
 18
 In authorizing federal employee status for the National Guard technicians, the purpose of this legislation is--
 
 
 19
 (a) [t]o provide a retirement and fringe benefit program which will be both uniform and adequate;
 
 
 20
 (b) [t]o recognize the military requirements and the State characteristics of the National Guard by providing for certain statutory administrative authority at the state level with respect to the technician program. (emphasis added)
 
 
 21
 (c) [t]o clarify the technician's legal status which in certain areas has been the subject of conflicting court decisions, especially on the matter of whether technicians are covered under the Federal Tort Claims Act regarding third party actions against the U.S. Government.
 
 
 22
 H.R.Rep. No. 1823, 90th Cong.2d Sess. (1968) reprinted in 1968 U.S.Code Cong. & Ad.News 3318, 3319.
 
 
 23
 A more express statement of congressional objectives could not be asked for, and none of these objectives suggests that Congress intended to reduce the state involvement in the Guard. Two of the goals--providing technicians with a uniform and adequate fringe benefit program and clarifying the status of Guard technicians for the purpose of the Federal Tort Claims Act--are irrelevant to whether technician supervisory personnel and the adjutant general act under color of state law. The third goal, to "recognize the State characteristics of the National Guard," casts the most light on the question of state action. In explaining the provisions about adjutant generals, for example, the House Report said:
 
 
 24
 This requirement is intended to achieve two purposes: a) recognize the State character of the Guard and b) meet the requirement of giving the adjutants general (who are State officers) the statutory function of employing Federal Employees.[10]
 
 
 25
 Id. at 3330. Under the 1968 Act, each Guard unit remained under the administration of the adjutant general. Significantly, he remained a state official under the Act. In the case at bar, the other defendants were subordinates of the adjutant general; his authority was needed to consummate their efforts to discharge appellees.
 
 
 26
 In short, we agree with the Fifth and Sixth Circuits that the 1968 Act left the Guard's administrative authority largely at the state level. The Guard has historically been a matter of intense interest on the state level and the state Guards have zealously fought to prevent federal encroachment. See generally M. Derthick, The National Guard In Politics (1965). Congress was apparently sensitive to this situation and elected to preserve the state administrative authority over the Guard. We are cognizant of the Guard's importance in the national military structure, see supra note 6. It is for Congress, however, not the courts, to establish the nature of the Guard. In 1968 Congress addressed the nature of the Guard and elected not to make the Guard's administration more federal in character. Accordingly, we see nothing that permits, much less compels us to depart from our holding in Lasher. See Syrek v. Pennsylvania Air National Guard, 371 F.Supp. 1349, 1351 (W.D.Pa.1974) ("After a review of the amended statute and its legislative history we do not think the amendment alters either the logic or the holding of Lasher ..."), rev'd on other grounds, 537 F.2d 66 (3d Cir.1976).
 
 
 27
 The dissent acknowledges the state's heavy involvement in the Guard program. It argues, however, that focusing on the particular challenged action--the discharge of appellees--compels the conclusion that appellants acted exclusively under color of federal law. This argument rests on the fact that, in administering the technician program generally and in his authority to dismiss technicians specifically, the adjutant general acts as an agent of the Secretary of the Air Force, 32 U.S.C. Sec. 709(c), (e)(3) (1982).
 
 
 28
 We cannot accept this argument; while the adjutant general acted as a federal agent in dismissing appellants, see Chaudoin v. Atkinson, 494 F.2d 1323, 1329 (3d Cir.1974), (adjutant general is federal agent for purposes of jurisdiction under 28 U.S.C. Sec. 1361), it does not follow that his actions were done exclusively under color of federal law.[11] The dissent recognizes that "Congress in the main permitted administrative control of the Guard to remain at the state level," but denies the authority at the state level where "personnel matters for civilian technicians" are concerned. Dis.Op. at 399. Control over technician personnel matters, however, was left at the state level by Congress. The dissent does not dispute that the adjutant general, a state officer, retains the discretion to determine when technicians are to be discharged as well as the authority to discharge them. Nor does it deny that, in the instant case, the adjutant general made and implemented the final decision to discharge appellees. The adjutant general's actions involved precisely the kind of administrative control over Guard personnel that Congress purposely left at the state level, see supra 390-391, not an "intentional deviation from the federal path," Ellis v. Blum, 643 F.2d 68, 83 n. 17 (2d Cir.1981).
 
 
 29
 The adjutant general's authority to dismiss technicians must be exercised pursuant to federal regulations. To infer from this fact that state action is absent, however, is far too great a leap. It rests on the erroneous assumption that the ultimate statutory source of authority is the sole inquiry for determining whether actions are under color of state law. In fact, all of the circumstances surrounding the challenged action must be taken into account. See Lake Country Estates Inc. v. Tahoe Regional Planning Agency, 440 U.S. 391, 99 S.Ct. 1171, 59 L.Ed.2d 401 (1979); Askew v. Bloemker, 548 F.2d 673, 677 (7th Cir.1976).[12] Here, when all of the circumstances are considered, the state action requirement is clearly met. See Rowe v. State of Tennessee, 609 F.2d at 264 ("It strains belief to think that the decision to discharge an individual technician was not within the statutory administrative authority at the state level.").
 
 IV.
 
 30
 The dissent argues that the 1968 Technicians Act preempts relief under section 1983. As the dissent notes, the Supreme Court has found certain remedies to preclude section 1983 actions--but only when it found that Congress clearly intended for such remedies to be exclusive. See, e.g., Middlesex City Sewerage Authority v. National Sea Clammers, 453 U.S. 1, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981) (Federal Water Pollution Control Act intended as exclusive remedy); Smith v. Robinson, --- U.S. ----, 104 S.Ct. 3457, 82 L.Ed.2d 746 (1984) (Education of the Handicapped Act intended as exclusive remedy); Great American Federal S & L Ass'n v. Novotny, 442 U.S. 366, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979) (Title VII intended as exclusive remedy).[13] We cannot infer from the 1968 Act that Congress wished to foreclose a section 1983 suit by Guard technicians.
 
 
 31
 The dissent finds evidence of Congress' intent to make the 1968 Act the exclusive remedy for Guard technicians in the prefatory language of section 709(e) that "Notwithstanding any other provision of law ..." the terms of the Act are to apply. This language, however, establishes only that the terms of section 709(e) may not be preempted by other statutes, not that the Act provides the exclusive remedy for Guard technicians. That is, Congress clearly intended that in a conflict between section 709(e) and another statute, the terms of section 709(e) must be followed. It may be, however, that statutes which do not conflict with the 1968 Act may supplement its terms. For this reason, we disagree with the dissent's view that our holding in New Jersey Air National Guard v. Federal Labor Relations Authority, 677 F.2d 276 (3d Cir.1982) suggests that the 1968 Act provides the exclusive remedy for Guard technicians.
 
 
 32
 In that case we were faced with a direct conflict between the Federal Labor Management Act (FLMA) and the Technicians Act, i.e., "whether the Technicians Act continues to prohibit appeals from certain decisions of the state adjutant general despite the provisions of the Labor-Management Act, which would ordinarily require the establishment of procedures for such appeals." Id. at 281. Faced with this conflict we held that "section 709(e) must be read to override any conflicting provisions of law in existence at the time that the Technicians Act was enacted." Id. at 283. (emphasis added). The case at bar does not present such a conflict between two statutes. Allowing appellees a section 1983 remedy does not conflict with any terms of the 1968 Act;[14] The Guard's internal administrative processes, as established by the 1968 act, remain intact "notwithstanding" the bringing of a section 1983 action.
 
 
 33
 We must also reject the dissent's argument that the "comprehensive" nature of the 1968 Act suggests that Congress intended it as an exclusive remedial scheme. The statute that preceded the 1968 Act was anything but a comprehensive remedial scheme; it was limited to technical aspects of the technician program such as the sources of funding of the Guard. The 1968 Act amended the earlier statute to make Guard technicians federal employees, primarily in order to clarify their status with respect to retirement benefits and the Federal Tort Claims Act. See supra 392-393. Congress also took the opportunity to establish certain internal administrative procedures of the Guard. 32 U.S.C. Sec. 709(e). The context in which the 1968 Act was passed suggests that the provisions establishing a "remedial scheme" were designed merely to clarify the internal procedures and authority of the Guard in the wake of the technicians' new status as federal employees. There is no evidence in the legislative history that Congress was crafting a comprehensive remedial scheme intended to preclude other remedies available to technicians.[15] Indeed, congressional discussion of the statute is almost entirely bereft of reference to either section 709(e) specifically or the statute's role in creating a "remedial scheme" generally.
 
 
 34
 Thus the 1968 Act is on a very different footing from the statutes at issue in Sea Clammers, Novotny, and Robinson: the Federal Water Pollution Control Act, Title VII of the Civil Rights Act of 1964, and the Education of the Handicapped Act, respectively. In each of those instances, the legislation represented Congress' effort to deal with a pressing national problem in a comprehensive manner. The statutes were voluminous and detailed. They had particular provisions explaining the remedies available to classes of plaintiffs, and detailing the circumstances under which aggrieved parties could pursue their rights in state or federal courts. By contrast, the 1968 Technicians Act did not address a pressing national problem, nor did it involve comprehensive reform. Rather, it clarified an internal administrative procedure by which discharged employees could pursue their grievances. Given section 1983's critical historical role in vindicating constitutional rights, we should not lightly infer that such a statute as the Technicians Act was intended to displace it.[16]
 
 
 35
 The dissent suggests that courts should "refrain from interfering" with congressional policy. Dis.Op. at 403. We agree, but we do not agree that our unwillingness to prevent appellees from bringing a section 1983 action constitutes interference with Congress. On the contrary, our holding adheres to the policy of judicial deference set forth by the Supreme Court in the Sea Clammers line of cases, i.e., ruling out certain remedies only when it can be clearly inferred that Congress intended their preemption. We simply cannot draw that inference from legislation that amended a technicial statute primarily to clarify the employment status of Guard technicians. The fact that the Act included a provision governing the internal administrative procedures to be followed when technicians are discharged does not justify the conclusion that Congress intended it as the sole remedy for Guard technicians.[17]
 
 V.
 
 36
 For the reasons discussed above, we hold that appellants acted under color of state law in participating in personnel decisions resulting in the discharge of appellees. As we cannot infer congressional intent to preclude Guard technicians from bringing section 1983 actions against their superiors, we will affirm the district court's decision that appellees may maintain a cause of action against appellants under section 1983.
 
 
 37
 ROSENN, Circuit Judge, dissenting.
 
 
 38
 I respectfully dissent on two separate and independent grounds.
 
 
 39
 First, I cannot agree that a state official who is a designated agent of the federal government acts under color of state law when he discharges a federal employee. Second, I do not believe that Congress ever intended to make the remedies of section 1983 available to aggrieved federal employees where Congress has specifically designed a comprehensive system of remedies for them by which grievances can be pursued and, as in this instance, the termination of federal employment successfully challenged. See Johnson v. Orr, 776 F.2d 75 (3d Cir.1985).
 
 I.
 
 40
 The plaintiffs, Johnson and Sheller, were employed by the New Jersey Air National Guard (ANG or the Guard) as civilian technicians. Specifically, they had been employed as aircraft mechanics on the night shift at the ANG 108th Tactical Fighter Wing at the McGuire Air Force Base (Tactical Wing) and served also as stewards for the technicians' union, Local 377 of the American Federation of Government Employees.
 
 
 41
 Congress authorized the employment of civilian technicians to perform services under the National Guard Technicians Act of 1968, 32 U.S.C. Sec. 709 (1982) (the Act). Prior to the 1968 amendments, technicians were persons who cared for material, armament, and equipment of the Army and Air National Guard. 32 U.S.C. Sec. 709(d) unequivocally converted the technicians into federal employees.[1] In summarizing the major provisions of the Act, Congressman Bray of Indiana, who played a role in the development of the legislation, explained that one of the provisions converted national guard technicians to federal employee status and another required "adjutants general to be the sole agent for employment and administration of the technician program under regulations prescribed by the Secretary concerned." 114 Cong.Rec. H24709 (daily ed. August 1, 1968) (statement of Rep. Bray). He further explained that "[t]hese employees have their salaries paid in full by the Federal Government and must meet all the mental and physical standards as well as professional qualifications prescribed by the military department." Id. The Act also provided that in the case of the technicians assigned to perform operational duties at air defense sites, the Secretary of the Air Force may prescribe their hours of duties and their rates of basic and additional compensation. 32 U.S.C. Sec. 709(g)(1). The scheme of the Act authorizes the Secretary concerned "to designate the adjutants general [of each State, the Territories, and the District of Columbia] to employ and administer the technicians authorized ...", 32 U.S.C. Sec. 709(c), and empowers them to separate technicians from employment for cause. 32 U.S.C. Sec. 709(e)(3).
 
 
 42
 In the instant case, the majority acknowledges that the plaintiffs here were "federal employees" at the time of their discharge. Maj. op. 389. The majority does not consider this dispositive, and standing alone it may not be, although it is significant. The crucial question, as stated by the majority, is whether the Act "was either intended to render," or effectively rendered the National Guard "more federal in character to the point where technician supervisory personnel and the adjutant general can no longer be considered as acting under color of state law when participating in personnel decisions resulting in the discharge of ANG technicians." Maj. op. 391. I disagree that this is the crucial question. I believe the question is: did the State of New Jersey play any part in the challenged personnel action--the termination of the plaintiffs' employment as technicians in the ANG?
 
 
 43
 Because the technicians were federal employees, the State did not pay their salaries, prescribe their duties, or have power to discharge them. Only their employer could have fulfilled this role, not the State. Accordingly, Congress, by statute, specifically provided that the adjutant general could separate technicians from employment. 32 U.S.C. Sec. 709(e)(3). We have therefore held that at least for purposes of mandamus jurisdiction, "there can be no doubt" that the adjutant general of the State, although he has not been called into active service, "is an agency or an agent of the United States." Chaudoin v. Atkinson, 494 F.2d 1323, 1329 (3d Cir.1974).
 
 
 44
 Thus, regardless of the hybrid character of the National Guard, the State played no part in the plaintiffs' separation from employment. Although the adjutant general, unlike the technicians, retained his status under the Act as a state official and was the chief acting executive of the ANG, his power to terminate civilian technicians stemmed only from his designated statutory authority to act as a federal agent. "The mere fact that the federal agents happen to be state officials does not, without more, convert every intentional deviation from the federal path into an action under color of state law." Ellis v. Blum, 643 F.2d 68, 83 n. 17 (2d Cir.1981).
 
 
 45
 It is not unusual in modern society, and especially in state government, for a versatile person to serve in two capacities or wear "two hats." For example, the Secretary of Health and Human Resources regularly enters into agreements with state agencies delegating authority to them to make initial determinations as to eligibility for social security disability benefits. See Ellis v. Blum, 643 F.2d at 70, 83 n. 17. State or municipal police officers are at times assigned to federal investigations, and for that limited purpose act under color of federal law, even though for other purposes they remain accountable to their respective hiring employers. See Askew v. Bloemker, 548 F.2d 673, 677 (7th Cir.1976). It is not uncommon for truck drivers hired by one employer to be assigned, along with the original employer's truck, to another employer under a lease agreement. For the purpose of the bailment, the truck driver is considered the employee of the lessee although the driver may otherwise be accountable to his original employer.
 
 
 46
 Therefore, it is essential that we should look at the capacity in which the official is acting and the character of the act in question. Accordingly, in Moose Lodge No. 107 v. Irvis, 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972), the Court focused on the specific conduct challenged. The Court there held that despite the state licensing scheme for private clubs engaged in the sale of liquor, and the comprehensive regulations imposed by the Pennsylvania Liquor Control Board upon them, "the operation of the regulatory scheme enforced by the Pennsylvania Liquor Control Board [did] not sufficiently implicate the State in the discriminatory guest policies of Moose Lodge to make the latter state action within the meaning of the Equal Protection Clause of the fourteenth amendment." Id. at 177, 92 S.Ct. at 1973.
 
 
 47
 Therefore, the question whether "state action" is present or absent does not require examination of the overall nature of the organization involved or the overall regulatory scheme brought to bear upon it, but of the character of the specific conduct that is challenged. In this case, the action challenged is the termination of employment. In Jackson v. Metropolitan Edison Co., 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974), the action challenged was the termination of service to a consumer by a regulated utility company. Even assuming that the State had conferred monopoly status on the utility, a point advanced by the plaintiff, the Court held that merely because
 
 
 48
 a business is subject to state regulation does not by itself convert its action into that of the State for purposes of the Fourteenth Amendment. Nor does the fact that the regulation is extensive and detailed, as is in the case of most utilities, do so.... [T]he inquiry must be whether there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself.
 
 
 49
 Id. at 350-51, 95 S.Ct. at 453 (emphasis added, citation omitted).
 
 
 50
 In the instant case, the State had no involvement in the plaintiffs' discharge; the State was not their employer. The adjutant general in discharging them acted solely in behalf of the Air Force Secretary, his designated superior for this purpose. Although the ANG by its very structure and purpose has numerous ties to the State, it depends for technician manpower vitality upon the federal government. An essential link in the maintenance of that vitality is the adjutant general, who has federal statutory authority to hire, pay, supervise, and terminate the National Guard civilian technicians. When he acts in this capacity, including the exercise of his authority and discretion to discharge, he acts under color of federal and not state law.
 
 
 51
 The majority reaches its result by relying for "strong guidance" on our opinion in Lasher v. Shafer, 460 F.2d 343 (3d Cir.1972). As Judge Gibbons, the opinion writer in that case, noted, the legislation under which the appellant was disciplined in that case was "substantially amended" by the Technician Act of 1968. Id. at 346 n. 4. The amendments, as I have related above, converted the "caretaker" status of the technicians into a federal employment relationship. Lasher's status as an employee may not have been relevant in his case, but the plaintiffs' status is germane in this case because, under the 1968 amendments, only a federal agency or federal agent could effectuate their discharge.
 
 
 52
 Furthermore, we decided Lasher two years before the Court's pronouncement in Jackson v. Metropolitan Edison Co., which maintained that courts should focus on the specific act at issue. In contradistinction from this case, where the appellants acted in their capacities as technicians, the court in Lasher did not see "how the acts alleged in the complaint, if they occurred, were in any way related to the care of the entrusted federal property. The acts complained of ... were done in the capacity of member or employee of the Commonwealth militia, and in pursuit of that militia's perceived interests." Id. at 347. Thus, Lasher did not address a case where the act at issue constitutes a duty assigned by federal law to a federal agent. That is precisely the situation here where the amendments of 1968 have transformed what was a loose funding relationship under the former Caretaker Program into one in which the adjutant general is a statutorily designated federal agent with authority over federal employees. Although as the majority states, the adjutants general remained state officials under the Act, Maj.Op. 388, the Act indeed changed their status with respect to hiring, paying, prescribing duties, and discharging civilian technicians by making them full federal agents for such purposes.
 
 
 53
 In Ellis v. Blum, the court held that state social services officials who administer the federal Social Security Act under federal authority did not act under color of state law for purposes of section 1983. 643 F.2d at 83. The court noted, as referred to above, that in performing the challenged act (making eligibility determinations for social security disability benefits), the officials acted under federal authority. Id. at 83 n. 17.
 
 
 54
 The Askew court held that St. Louis police officers assigned to a federal investigation acted under color of federal law. The plaintiff argued that the officers were "dual-status" agents acting concurrently under state and federal law. The officers remained accountable to the St. Louis Police Department (SLPD). They were paid, however, by the federal government through checks issued by the SLPD, were subject to the immediate control of federal officials, and were covered by the Federal Employees Compensation Act for injuries suffered while on assignment. Holding that the officers' ties with the federal government stamped their role in the challenged conduct as federal and not state, the court asserted that these facts
 
 
 55
 cast an indelibly federal hue upon the activities of these agents, even though they maintained official links with the SLPD. Furthermore, the totality of the circumstances surrounding the alleged raid out of which plaintiff's Sec. 1983 claim arises clearly shows that these agents were acting pursuant to federal authority and not under color of any state law.
 
 
 56
 Askew, 548 F.2d at 677.
 
 
 57
 The Askew court focused on the act at issue, not on the broader relationship between the police officers and the SLPD. It noted that the St. Louis officers participated in a raid in Illinois, and therefore could have acted only in their capacity as federal agents. Id. Just as the St. Louis officers could not operate in Illinois in their capacity as state officials, so the New Jersey Adjutant General could not terminate federal employees in his capacity as a state official.
 
 
 58
 I therefore disagree with the holdings of the Fifth and Sixth Circuits in NeSmith v. Fulton, 615 F.2d 196 (5th Cir.1980), and Rowe v. Tennessee, 609 F.2d 259 (6th Cir.1979), both cited by the majority. These courts held that adjutants general, in terminating civilian technicians, act under color of state law. NeSmith relied chiefly on a statement in the legislative history that authority over the Technician Program would remain "as a matter of law ... at the state level." Id. at 200 (quoting H.R. No. 1823, 90th Cong., 2d Sess. (1968), 1968 U.S.Code Cong. & Ad.News 3324). A careful reading of the Report reveals only that technicians "will be subject to certain supervisory controls at the State level which would not apply in the case of the typical civil service employees." 1968 U.S.Code Cong. & Ad.News 3324. Contrary to the NeSmith court's assumption, this statement does not answer the "color of state law" question. Although Congress in the main permitted administrative control of the Guard to remain at the state level, it deliberately separated personnel matters for civilian technicians and delegated them to the Secretary of the Army or Air Force as the case may be. The adjutants general remain state officials, as I have already alluded, but for purposes of terminating civilian technicians, they can act only under federal authority. The Nesmith and Rowe courts failed to see this distinction; they did not focus on the act of termination that was being challenged. In addition, the Rowe court was strongly influenced by the decision in Lasher, supra at 397, which dealt with the National Guard before the 1968 amendment. 609 F.2d at 264.
 
 
 59
 Rowe also relied on a policy rationale that is no longer valid. The court explained that it sought to provide a complete scheme of remedies for constitutional violations, whether committed under color of federal or state law. Rowe, 609 F.2d at 264-65. This complete scheme would comprise the complementary remedies of Bivens suits and section 1983 actions, respectively. Id. However, Bush v. Lucas, 462 U.S. 367, 103 S.Ct. 2404, 76 L.Ed.2d 648 (1982), decided since Rowe, and discussed infra at 402-03, rejects this rationale.
 
 
 60
 I would therefore hold that the New Jersey Adjutant General did not act under color of state law when he terminated the plaintiffs.
 
 II.
 
 61
 Even assuming the presence of state action, perhaps a more compelling reason for denying relief under section 1983 is that Congress intended to make remedies to aggrieved civilian technicians available only under the 1968 amendments. I base this statement on two grounds: (1) prefatory language in the Act, and (2) the comprehensive system Congress designed in the Act by which technicians could pursue grievances arising out of termination of their employment. In this instance, the plaintiffs took advantage of that system and appealed to the district court under the provisions of the Administrative Procedure Act (APA), 5 U.S.C. Sec. 701 (1982), and ultimately to this court. We affirmed the grant of summary judgment in favor of the plaintiffs on their due process claims. Johnson v. Orr, 776 F.2d 75 (3d Cir.1985).[2]A.
 
 
 62
 The language of the Technicians Act expressly preempts relief under earlier statutes. The preface to section 709(e) of the Act provides that its terms shall apply "[n]otwithstanding any other provision of law...." We interpreted this language in New Jersey Air National Guard v. Federal Labor Relations Authority, 677 F.2d 276 (3d Cir.1982), as overriding all other statutory remedies. The question in the case was whether ANG was obliged to bargain over certain conditions of employment. One issue in contention was whether there should be a procedure, consisting of binding arbitration, by which an aggrieved employee could challenge an adverse disciplinary procedure. The court had before it the construction of the Technicians Act of 1968 and conflicting provisions of the Federal Labor Management Act enacted ten years later. The court had no difficulty in construing the preclusive effect of section 709(e) of the 1968 Act as overriding all prior statutory remedies. "A clearer statement is difficult to imagine: section 709(e) must be read to override any conflicting provision of law in existence at the time that the Technicians Act was enacted." Id. at 283. This statement by our court should lead us to hold that section 1983 actions are unavailable to civilian technicians employed under the Act.
 
 B.
 
 63
 Setting aside the preface to section 709(e) of the Act, analyses of section 1983 and of the Technicians Act disclose that relief under section 1983 in this context is unnecessary and inappropriate. Congress enacted 42 U.S.C. Sec. 1983 in response to lawless conditions existing in some states during the period following the Civil War, which rendered life and property insecure and which the states were unwilling or powerless to correct. The legislative history of this act and the statute itself "suggests that the Reconstruction Congress had grave doubts about the reliability of state courts as protectors of federal rights, and thus intended that federal courts exist as fully independent alternatives to state court systems." L. Tribe, American Constitutional Law, Sec. 3-41, at 155 (1978). Federal courts, under the Act, were compelled to intervene because the states were not adequately deterring and correcting egregious constitutional violations. Although the legislation had several subordinate purposes, its broad aim "was to provide a federal remedy where the state remedy, though adequate in theory, was not available in practice." Monroe v. Pape, 365 U.S. 167, 174, 81 S.Ct. 473, 477, 5 L.Ed.2d 492 (1960).
 
 
 64
 Cognizant of the history and purposes of 42 U.S.C. Sec. 1983, the Court had an opportunity to review the reach of the statute in Parratt v. Taylor, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1980). In that case, a state prisoner sued prison officials under section 1983 for loss of property, claiming a deprivation of due process rights under the fourteenth amendment. Distinguishing the plaintiff's claim from the illegal search and seizure claim in Monroe v. Pape, the Court acknowledged the presence of action under color of state law and a deprivation of property. It held, however, that a cause of action would not lie because the deprivation resulted from a random and unauthorized act and because state law afforded the prisoner a post-deprivation remedy. "This procedure was in existence at the time of the loss here in question but [the prisoner] did not use it." Id. at 543, 101 S.Ct. at 1917. Thus, the Court considered the presence of a remedy available for the violation as significant.
 
 
 65
 In the instant case as well, plaintiffs had an available remedy. Not only was the remedy handy, but the plaintiffs Johnson and Sheller took full advantage of it. Section 709(e) of the Act provides for separation for cause or separation for failure to continue membership in or specified grade in the National Guard. In the event of termination as a technician, the technician must be given written notice "at least thirty days prior to the termination date of such employment." 32 U.S.C. Sec. 709(e)(6). The Act also provides for a right of appeal to the adjutant general.[3] The plaintiffs utilized the appeal procedure set forth in the Act and then exercised their right to proceed with an action against their employer under the Administrative Procedure Act (APA). They sued for reinstatement under the APA and the courts found their terminations to be contrary to law.[4] Johnson v. Orr, 776 F.2d at 82-83. In addition, plaintiff Johnson's suit for back pay has been transferred to the United States Court of Claims. To impose section 1983 as another layer of protection for technicians is not only supererogatory; it unbalances Congress' carefully crafted National Guard personnel system. It counters a congressional intent that the Technicians Act provide the exclusive avenue of relief for civilian technicians.
 
 
 66
 Because Congress tailored section 709 to provide the protections it thought best served the goals of the technician program, it established section 709 as the exclusive remedy for technicians. It ensured that they would not have available, as an alternate channel, the grievance procedures generally afforded federal employees. 32 U.S.C. Sec. 709(f) specifically provides that 5 U.S.C. Secs. 7511 and 7512, both of which deal with removal and suspension of federal employees, do not apply to technicians. Section 7512 is the provision of the Civil Service Reform Act of 1978 that establishes procedures to be followed in taking adverse actions against federal employees. This legislative scheme demonstrates that Congress intended the procedures provided in the Technicians Act and the APA to serve as the exclusive channel for technician appeals.
 
 
 67
 The Supreme Court has in recent years refused to allow section 1983 suits where Congress has already crafted a comprehensive remedial scheme to address a specific problem. Such comprehensive legislation evinces a congressional intent that such a scheme be exclusive. Support for this view can be found in Middlesex County Sewage Authority v. National Sea Clammers Association, 453 U.S. 1, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981), where plaintiffs brought suit against the federal government and various state entities and officials alleging, inter alia, violations of the Federal Water Pollution Control Act (FWPCA), 33 U.S.C. Sec. 1251 et seq. (1976 ed. and Supp. III), and the Marine Protection, Research, and Sanctuaries Act (MPRSA), 33 U.S.C. Sec. 1401 et seq. (1976 ed. and Supp. III). The Court addressed the availability to plaintiffs of a section 1983 suit based on the two environmental statutes and the "and laws" provision of section 1983. It held that a section 1983 suit was precluded because Congress had provided such tailored and comprehensive remedies in the two environmental statutes that it must have intended that those remedies be exclusive.
 
 
 68
 When the remedial devices provided in a particular Act are sufficiently comprehensive, they may suffice to demonstrate congressional intent to preclude the remedy of suits under Sec. 1983. ... [T]he FWPCA and MPRSA do provide quite comprehensive enforcement mechanisms. It is hard to believe that Congress intended to preserve the Sec. 1983 right of action when it created so many specific statutory remedies.... We therefore conclude that the existence of these express remedies demonstrates not only that Congress intended to foreclose implied private actions but also that it intended to supplant any remedy that otherwise would be available under Sec. 1983.
 
 
 69
 Id. at 20-21, 101 S.Ct. at 2626-27 (citations omitted).[5]
 
 
 70
 The Court reaffirmed this reasoning in Smith v. Robinson, --- U.S. ----, 104 S.Ct. 3457, 82 L.Ed.2d 746 (1984). In Smith, parents brought suit on behalf of their handicapped child under, inter alia, the Education of the Handicapped Act (EHA), 20 U.S.C. Sec. 1400 et seq. (1982), and 42 U.S.C. Sec. 1983. The Court focused on whether the EHA precluded all other avenues of relief. It held that Congress had indeed intended "the EHA to be the exclusive avenue through which a plaintiff may assert an equal protection claim to a publicly financed special education." Id. at ----, 104 S.Ct. at 3468. As in Sea Clammers, the Court inferred this legislative intent from the existence of the specific remedial scheme:
 
 
 71
 The EHA is a comprehensive scheme set up by Congress to aid the States in complying with their constitutional obligations to provide public education for handicapped children. Both the provisions of the statute and its legislative history indicate that Congress intended handicapped children with constitutional claims to a free appropriate public education to pursue those claims through the carefully tailored administrative and judicial mechanism set out in the statute.
 
 
 72
 Id. at ----, 104 S.Ct. at 3468. The Court emphasized that, in light of the "comprehensive nature" of the Act, allowing a handicapped child to go directly to court with an equal protection claim, even though the claims alleged were based on independent constitutional violations rather than violations of the EHA, would render much of the Act superfluous and run counter to the congressional view of the best manner of addressing the problem. Id. at ---- - ----, 104 S.Ct. at 3468-70.
 
 The Court concluded its analysis:
 
 73
 [Section] 1983 is a statutory remedy and Congress retains the authority to repeal it or replace it with an alternative remedy. The crucial consideration is what Congress intended.
 
 
 74
 In this case, we think Congress' intent is clear. Allowing a plaintiff to circumvent the EHA administrative remedies would be inconsistent with Congress' carefully tailored scheme. The legislative history gives no indication that Congress intended such a result. Rather, it indicates that Congress perceived the EHA as the most effective vehicle for protecting the constitutional right of a handicapped child to a public education.
 
 
 75
 Id. at ----, 104 S.Ct. at 3469 (citations and footnotes omitted). See also Guardians Association v. Civil Service Commission of the City of New York, 463 U.S. 582, 610 n. 3, 103 S.Ct. 3221, 3223 n. 3, 77 L.Ed.2d 866 (Powell, J., concurring) ("I also would hold that private actions asserting violations of Title VI may not be brought under 42 U.S.C. Sec. 1983. Congress' creation of an express administrative procedure for remedying violations strongly suggests that it did not intend that Title VI rights be enforced privately either under the statute itself or under Sec. 1983.").
 
 
 76
 In drafting the Technicians Act, Congress had to consider the twin demands of (1) federal personnel policy, and (2) the military mission and sui generis status of the National Guard.[6] Both considerations are within the arena of congressional expertise and appropriate deference to Congress dictates that courts refrain from interfering.
 
 
 77
 Limiting National Guard employees to statutorily provided remedies would maintain consistency with judicial policy regarding all federal employees. Courts generally funnel federal employee grievances into systems specifically created for them, rather than allow suits on other theories. For example, as noted in the district court opinion in this case, constitutional claims that are unfair labor practices fall within the exclusive jurisdiction of the FLRA. See also Purtill v. Harris, 658 F.2d 134, 137 (3d Cir.1981) (this court declined to recognize a Bivens cause of action because the federal employee was afforded complete and efficient remedy by the Age Discrimination Employment Act).
 
 
 78
 In New Jersey National Guard, supra, we had occasion to address the relationship of the Technicians Act to the Federal Labor Management Act (FLMA) requiring establishment of procedures for grievance appeals. Congress enacted the FLMA ten years after the Technicians Act, as distinguished from section 1983, which it adopted approximately one hundred years before in a wholly different context. Nonetheless, we rejected the contention that the FLMA overrode the very provisions of section 709(e) of the Technicians Act now before us. We emphasized the specificity of the Technicians Act and the logic of noninterference with the system it established.
 
 
 79
 A preference for the specific over the general statute makes considerable sense in the situation we confront here. Congress in 1968 turned its attention to the very class of federal employees involved in this dispute. It crafted with care precise provisions intended to meet concerns of federalism and military control that are duplicated nowhere else in the federal service. Legislators in 1968 stressed the importance of the provisions in question to the entire scheme of National Guard employment. One can only infer from this narrowly directed activity that Congress, upon consideration of the issue in dispute here--the right of appeal by a Guard technician--decided that very matter, with explicit and specific language, in 1968.
 
 
 80
 677 F.2d at 285-86. We concluded that, because the FLMA addressed all federal employees, "it appear[ed] inconceivable" that Congress intended it to override the system it had carefully devised in the Technicians Act. Id. at 286.
 
 
 81
 Turning to the instant case, it would appear a fortiori that Congress did not intend section 1983 to supplant or even augment the remedies it had established for aggrieved technicians in the 1968 Act. Moreover, section 1983 is separated from its moorings in purpose and time whereas the Technicians Act remains pertinent, pointed and specifically crafted for a unique military organization, specifically providing that the remedies therein provided would apply "[n]otwithstanding any other provision of law." 32 U.S.C. Sec. 709(e). I therefore believe that in the context of this litigation, an additional remedy under section 1983 is impermissible and unwarranted.
 
 C.
 
 82
 Appellants analogize to Bush v. Lucas, 462 U.S. 367, 103 S.Ct. 2404, 76 L.Ed.2d 648 (1983), which addressed a confluence of two of the factors discussed above: the wisdom of declining to employ a general remedy to interfere with a specific and comprehensive one, and the disinclination to interfere with congressional enactments concerning federal personnel policy. The Court in Bush addressed the role of Bivens actions, a parallel remedy to section 1983 for wrongs committed under color of federal law but without an available statutory remedy. Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). In allowing Bivens actions the Supreme Court created a federal nonstatutory remedy where no other remedy existed. Id. at 395-96. In Bush, however, the presence of a comprehensive civil service scheme rendered a Bivens action inappropriate. Bush, 462 U.S. at 368, 103 S.Ct. at 2406. The Court reasoned that the question was not what remedy should be provided for a wrong that would otherwise go unredressed but "whether an elaborate remedial system that has been constructed step by step, with careful attention to conflicting policy considerations, should be augmented by the creation of a new judicial remedy for the constitutional violation at issue." Id. at 388, 103 S.Ct. at 2416.[7]
 
 
 83
 In this case, the majority rejects the Bush rationale. The majority reasons that the separation-of-powers concern that deterred the Court in Bush from augmenting a statutory remedy with a judicial one is absent in a case involving section 1983 because it is a statutory action. The majority's language pays homage to the concepts of separation of powers and deference to congressional intent, but its conclusion does not. It overstates the difference between a section 1983 remedy and the judicially created Bivens remedy and understates the difference between section 1983 and recently enacted specific legislative remedies.
 
 
 84
 The majority's statement that section 1983 is a statutory remedy is, of course, correct, but its implied conclusion that it therefore takes precedence over later, more specific, legislation does not necessarily follow. The majority implicitly accepts the fallacious premise that all statutory remedies stand on equal footing. Yet the history, purposes, objectives, and timing of each must be weighed in a search for congressional intent. When one does such weighing, it seems certain that the recently enacted Technicians Act, with its specific remedial factors, negates the broad based legislation addressed to the correction of the disorders and chaos of the Reconstruction period. As we decided in New Jersey National Guard, 677 F.2d at 285, "A preference for the specific over the general statute makes considerable sense in the situation we confront here." See supra at 403.
 
 III.
 
 85
 In summary, when the adjutant general terminated the plaintiffs as federal employees, he exercised no state authority. He acted only as a statutorily constituted federal agent. In enacting the technicians Act of 1968, Congress structured a statute for the unique military status of the National Guard and its civilian technicians, and forged within its framework comprehensive procedural safeguards. It expressly precluded the application of earlier statutes.
 
 
 86
 In answer to the certified question of the district court, I would therefore respond that technician supervisory personnel and the adjutant general of the State of New Jersey, when participating in personnel decisions resulting in the dismissal of two technician employees under the authority of the National Guard Technicians Act, were not acting under color of state law for the purpose of section 1983. Even if they were, the remedies provided by the Technicians Act are exclusive and preclude a section 1983 action.
 
 
 87
 I therefore respectfully dissent.
 
 
 
 [1]
 See Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971)
 
 
 [2]
 All of the defendants except Orr and Gerard were charged with violating 42 U.S.C. Sec. 1983
 
 
 [3]
 In Johnson v. Orr, 776 F.2d 75 (3d Cir.1985), this panel heard an appeal on all aspects of the case except the one now before us. We upheld the district court's grant of summary judgment for appellees under the APA and for appellants on the claim of violation of due process. As a result of that disposition, the other claims brought under section 1983 are all that remains in the district court. Those claims have been stayed pending our decision on this interlocutory appeal. In addition, the United States Court of Claims retains jurisdiction over the damage claims
 
 
 [4]
 The National Guard Technicians Act of 1968 provides in part:
 A technician employed under subsection (a) is an employee of the Department of the Army or the Department of the Air Force, as the case may be, and an employee of the United States.
 32 U.S.C. Sec. 709(d).
 Thus the 1968 Act made Johnson and Sheller, as well as appellants, federal employees. Appellees' employment status is irrelevant, however, because "that status does not inform us whether those injuring him [them] acted under color of state or federal law." Lasher v. Shafer, 460 F.2d 343, 347 (3d Cir.1972).
 
 
 [5]
 "(e) Notwithstanding any other provision of law and under regulations prescribed by the Secretary concerned--
 * * *
 (3) a technician may, at any time, be separated from his technician employment for cause by the adjutant general of the jurisdiction concerned."
 
 
 [6]
 In their amicus briefs, the Adjutant Generals Association of the United States, and the State of California and Adjutant General of the California National Guard argue that because of the Guard's critical role in the United States' national defense, its disciplinary proceedings should be immune from review in the courts. See Chappell v. Wallace, 462 U.S. 296, 103 S.Ct. 2362, 76 L.Ed.2d 586 (1983); Feres v. United States, 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950). We do not reach the issue of military immunity, which appellants did not brief, because it is not part of the question certified by the district court. Cf. Ungar v. Dunkin, 531 F.2d 1211, 1215-16 nn. 4 & 5. (3d Cir.1976)
 
 
 [7]
 In Johnson v. Orr, 776 F.2d 75 (3d Cir.1985), the requirement that technicians retain their state membership defeated Johnson's claim for reinstatement. Despite our holding that Johnson was improperly discharged, we found him ineligible for reinstatement because he had left the New Jersey Guard
 
 
 [8]
 See also Engblom v. Carey, 522 F.Supp. 57, 65 (S.D.N.Y.1981), "[T]he Guard is the modern day successor to the Militia reserved to the states by Art. 1, Sec. 8 cls. 15, 16 of the Constitution..."
 
 
 [9]
 Appellants claim that the Fifth and Sixth Circuit cases are distinguishable from the instant case. They attempt to distinguish NeSmith and Shultz on the grounds that plaintiffs in those cases were discharged from their military positions in the state unit as well as from their positions as federal employees. However, as we noted in Lasher, the employee status of plaintiffs has no bearing on whether those injuring them acted under color of state law. 460 F.2d at 347 (3d Cir.1972). See supra note 4
 In Rowe, plaintiff, like appellees in the instant case, was dismissed only from his position as a technician. Appellants argue that Rowe is distinguishable because the plaintiff in that case alleged a campaign of harassment by both his military and his civilian supervisors. The Rowe court, however, quite clearly held that civilian supervisors could be liable under section 1983. The court first concluded that plaintiff's military and joint military/civilian supervisors, including the adjutant general, could act under color of state law. It proceeded to hold that civilian technicians also acted under color of state law if they acted pursuant to their supervisory authority over plaintiff. The court remanded the case, in part for a determination whether the challenged actions were made possible by defendants' official power or were mere private acts of harassment. In the instant case, it is unquestionable that appellants' actions were pursuant to their official authority.
 The dissent downplays the significance of Rowe by asserting that "the Rowe court was strongly influenced by Lasher ... which dealt with the National Guard before the 1968 amendment." Dis. Op. at 399. In fact, the Rowe court explicitly considered (and rejected) the possibility that that 1968 Act undercut the rationale in Lasher. 609 F.2d 264.
 
 
 [10]
 It is worth noting that the original House version of the Bill designated the State Adjutant General "or other appropriate persons" to administer the technicians program. The Senate version, deleted "or other appropriate persons" to ensure that the program would remain under state control. 114 Cong.Rec. h24709 (daily ed. August 1, 1968)
 
 
 [11]
 In Nesmith v. Fulton, 615 F.2d 196 (5th Cir.1980), the Fifth Circuit adopted our conclusion in Chaudoin that the adjutant general was a federal agent for jurisdictional purposes, but nevertheless held that he acted under color of state law in discharging technicians. Indeed, the Nesmith court stated that defendants had acted under color of federal as well as state law. Id. at 200-01 n. 7
 
 
 [12]
 The dissent erroneously asserts that Askew supports its position. The court in Askew found that municipal police officers involved in a federal investigation had not acted under color of state law. It did so, however, only because the "totality of the circumstances" surrounding the challenged operation showed that it was controlled by the federal authorities. 548 F.2d at 677. Here, the totality of the circumstances suggest that the real authority to discharge technicians is at the state level. Indeed, it is probable that the provisions making the adjutant general's authority over the technician program pursuant to federal regulations were primarily a means of clarifying the permissibility of a state official employing federal employees. It is certainly not the case that the adjutant general acts as an "agent" to the Secretary of the Air Force in the sense of carrying out his commands. On the contrary, as noted, the actual decision to discharge technicians, and the implementation of that decision, is made by the adjutant general
 
 
 [13]
 Indeed, in Novotny the Court clarified that its holding did not overturn the many cases where "we have held that substantive rights conferred in the 19th Century were not withdrawn, sub silentio, by the subsequent passage of the modern statutes." 442 U.S. at 377, 99 S.Ct. at 2351
 
 
 [14]
 Section 709(e)(5) says "a right of appeal ... shall not extend beyond the adjutant general of the jurisdiction concerned." That provision precludes further administrative appeals, not court review of the Guard's actions. New Jersey Air National Guard v. Federal Labor Relations Authority, 677 F.2d 276, 280 n. 3 (3d Cir.1982)
 
 
 [15]
 The dissent makes much of the fact that section 709(f) makes certain provisions of other civil service legislation inapplicable to Guard technicians. The dissent attaches particular significance to the fact that section 709(f) renders section 7512 of Title 5 inapplicable to Guard technicians. Since section 7512 establishes the procedures involved in adverse actions against federal employees, the dissent concludes that Congress intended the procedures described in section 709 as the exclusive channel for technician appeals. On the contrary, section 709(f) buttresses our view that the provisions of section 709 that establish a remedial scheme represent Congress' effort to clarify the administrative implications of making technicians federal employees. As guard technicians are anomalous federal employees in that their employment is administered at the state level, Congress apparently thought that the procedural avenues generally followed in cases involving federal employees were inappropriate. This decision concerned the internal administrative procedure of the Guard; it casts no light on what judicial remedies may be available to Guard technicians. Moreover, little significance can be read into Congress exempting technicians from the comprehensive remedies of the Civil Service Reform Act which was enacted 10 years after Congress exempted technicians from the coverage of section 7512
 
 
 [16]
 It is true that the Guard's actions are reviewable agency actions under the APA. The dissent suggests that appellees' remedies under the APA are adequate to redress their grievances, and, therefore, a section 1983 action is inappropriate. We reiterate that absent clear evidence of Congress' intent, it is not for the courts to pick and choose among a party's available remedies. In any event, while the dissent characterizes the APA and section 1983 as "roughly parallel remedies," Dis.Op. n. 4, punitive damages are available only in actions brought under the latter. See Carlson v. Green, 446 U.S. 14, 22, 100 S.Ct. 1468, 1473, 64 L.Ed.2d 15 (1980) ("[P]unitive damages are available in a proper Sec. 1983 action")
 
 
 [17]
 Appellants' analogy between this case and Bush v. Lucas, 462 U.S. 367, 103 S.Ct. 2404, 76 L.Ed.2d 648 (1983) is flawed. In Bush, the Court considered it inappropriate to imply a Bivens -type cause of action for a federal employee against his employer because congressional enactment of a comprehensive civil service scheme was a "special factor counselling hesitation" to imply the requested remedy. Id. at 390, 103 S.Ct. at 2417. The Court characterized the issue as follows: "whether an elaborate remedial system that has been constructed step by step, with careful attention to conflicting policy considerations, should be augmented by the creation of a new judicial remedy." Id. at 388, 103 S.Ct. at 2416. (emphasis added) We have already seen that this case does not involve an elaborate remedial system. In any event, appellees have not asked us to augment their remedies with "the creation of a new judicial remedy." The court in Bush was concerned that permitting a Bivens cause of action violated the province of Congress. Here that same deference cautions against denying appellees the statutory remedy of section 1983
 We must likewise reject appellants' argument that, in the wake of Bush, allowing section 1983 actions against the National Guard "would create technicians as a special class of federal employees" with "remedies for alleged constitutional violation against their supervisors." (appellants' brief at 20). National Guard technicians, like everyone else, may bring a section 1983 against those who violate their constitutional rights while acting under color of state law. Our decision today does not create a special class of federal employees. Guard technicians are "special," in the sense that some remedies may be available to them that are not available to other federal employees, only because of the hybrid status of the guard. To be sure, the blessing is a mixed one: Guard technicians are also rare federal employees who can be liable under section 1983. See Rowe v. State of Tennessee, 609 F.2d 259 (6th Cir.1979).
 
 
 [1]
 The pertinent provision of section (d) provides:
 A technician employed under subsection (a) is an employee of the Department of the Army or the Department of the Air Force, as the case may be, and an employee of the United States.
 
 
 [2]
 Although the district court's grant of summary judgment reversed the plaintiffs' termination of employment and transferred their claims for back pay to the United States Court of Claims, it did not order reinstatement because they no longer satisfied the federal statutory requirement for civilian technicians. Sheller had resigned from the National Guard and Johnson had transferred his military service to the Pennsylvania Air National Guard
 
 
 [3]
 Technician Personnel Manual 753, promulgated by the National Guard Bureau, details the appellate process that each adjutant general must afford his jurisdiction's technicians. See Subchapter 4, "Appeals," Subchapter 5, "Conduct of the Hearing," and Appendices A, "Adverse Action Flow Chart," and B, "Sample Notices." In addition, the New Jersey Department of Defense promulgated NJANG Regulation 40-13 to "implement the provisions of the National Guard Bureau Technician Personnel Manual, Technician Personnel Pamphlets, and applicable regulations of the United States Civil Service Commission's Federal Personnel Manual." NJANGR 40-13, chapter 1-1. Chapter 7 "Personnel Relations and Services" further details the appeals process outlined in the Technician Personnel Manual
 
 
 [4]
 The APA generally creates a cause of action when a plaintiff alleges that federal officials have violated federal law. 5 U.S.C. Secs. 702, 706 (1982). Chrysler Corp. v. Brown, 441 U.S. 281, 317-18, 99 S.Ct. 1705, 1725-26, 60 L.Ed.2d 208 (1978). Together, section 1983 and the APA form a system of roughly parallel remedies, the former applying to the states and the latter to the federal government. It is therefore anomalous to grant relief under both statutes for the same alleged wrongful act
 
 
 [5]
 The majority acknowledges that 1983 actions are precluded where a comprehensive remedial scheme covering a specific area evinces a congressional intent to preclude other remedies. The majority, however, inexplicably chooses not to infer such congressional intent from the presence of the specific and comprehensive scheme prescribed by the Technicians Act. Maj. op. at 393-395
 
 
 [6]
 The technicians' tasks parallel those of other civilian employees but arise in a distinctly military context and tinge the employment relationship with "significant military concerns." New Jersey Air National Guard, 677 F.2d at 279
 
 
 [7]
 Appellant alleged a Bivens cause of action in the district court. The court, citing Bush, dismissed the claim as inappropriate in this context. No appeal was taken from the dismissal